OWNER OPERATOR INDEPENDENT
DRIVERS ASSOCIATION, INC.,
et al., Plaintiffs,

v.

ARCTIC EXPRESS, INC. and D &
A Associates, Ltd., Defendants.

No. 97–CV–00750.

United States District Court,
S.D. Ohio,
Eastern Division.

Aug. 30, 2001.

See also See also 192 F.3d 778.

James Burdette Helmer, Jr., Helmer Martins & Morgan, Cincinnati, OH, Paul D. Cullen, Sr., Gregory Michael Cork, The Cullen Law Firm, Washington, DC, Thomas Patrick McCann, Joyce E. Mayers, Cullen Law Firm, Washington, DC, for Plaintiffs.

Thomas Leslie Long, A Charles Tell, Baker & Hostetler—2, Columbus, OH, for Defendants.

## OPINION AND ORDER

MARBLEY, District Judge.

### I. INTRODUCTION

This matter is before the Court on the Plaintiffs' Motion for Partial Summary Judgment filed on September 6, 2000, and on the Defendants' Cross–Motion for Summary Judgment filed on September 29, 2000. The Plaintiffs originally brought suit on June 30, 1997, alleging that the agreements they entered into with the Defendants violated the Motor Carriers Act, 49 U.S.C. §§ 14101–02 and 14704, and the Regulations promulgated under the Act, 49 C.F.R. Part 376. For the following reasons, the Plaintiffs' Motion for Partial Summary Judgment is **GRANTED,** and the Defendants' Cross–Motion is **DENIED.**

### II. FACTS AND PROCEDURAL HISTORY

#### A. Procedural History

On June 30, 1997, the Plaintiffs, Owner Operator Independent Drivers Association, Inc., Carl Harp, Garvin Keith Roberts and Michael Wiese, filed their Complaint against Arctic Express, Inc. and D & A Associates, alleging in Count I a violation of 49 C.F.R. § 376.12(i) (unauthorized deduction of purchase or rental payments), and in Count II a violation of 49 C.F.R.

§ 376.12(k) (unauthorized deduction and non-return of escrow funds).

On September 5, 1997, the Defendants filed a Motion to Dismiss for Failure to State a Claim Upon Which Relief Can be Granted, and on January 15, 1998, filed a Motion to Dismiss Under Doctrine of Primary Jurisdiction. By Order dated August 17, 1998, this Court stayed this action pending the Defendants' appeal to the Sixth Circuit. On appeal, this case was transferred to the Eighth Circuit Court of Appeals for consolidation with three other cases.

The Eighth Circuit issued the opinion of *Owner–Operator Independent Drivers Association, Inc. v. New Prime, Inc.*, 192 F.3d 778 (8th Cir.1999), on August 10, 1999, and denied the petition for review of this case. By Order dated October 13, 1999, the Eighth Circuit denied the Petition for Rehearing and for Rehearing En Banc.

The stay was lifted early in 2000. On March 3, 2000, this Court issued *Owner–Operator Independent Drivers Association v. Arctic Express, Inc.*, 87 F.Supp.2d 820 (S.D.Ohio 2000), in which the Court treated the Defendants' Motion to Dismiss as one for summary judgment and granted summary judgment to the Defendants as to Count I, but denied it as to Count II. The Court also denied the Defendants' Motion to Dismiss under the doctrine of primary jurisdiction.

This matter is now before the Court on the Plaintiffs' Motion for Partial Summary Judgment filed on September 6, 2000, and on the Defendants' Cross Motion for Summary Judgment filed on September 29, 2000.

### B. Facts[1]

The Plaintiff, Owner Operator Independent Drivers Association, Inc. ("OOIDA"), is a business association comprised of individuals and entities who own and operate motor vehicle equipment. The three individual Plaintiffs, Carl Harp, Garvin Keith Roberts and Michael Wiese ("Members"), are persons who have entered into a Lease Purchase Agreement with Defendant, D & A Associates, Ltd. ("D & A"), and a Motor Vehicle Lease Agreement with Defendant, Arctic Express, Inc. ("Arctic"). Arctic is a regulated motor carrier engaged in the business of providing transportation services to the shipping public. D & A is a non-carrier company engaged in the business of leasing truck tractor units to independent owner-operators. D & A and Arctic are under common ownership and control.

Owner-operators are small business men and women who own or control truck tractors used to transport property on the country's highways. Owner-operators either transport commodities exempt from Department of Transportation ("DOT") Regulations, or, as independent contractors, lease or provide their equipment and services to motor carriers who possess the legal operating authority under DOT regulations to enter into contracts with shippers to transport property. The relationship between independent truck owner-operators and regulated carriers is set forth in an agreement between the parties and regulated by DOT.[2] *See* 49 U.S.C. § 14102; 49 C.F.R. pt. 376.

---

1. The facts are taken in part from this Court's March 3, 2000 Opinion.

2. In 1995, the Interstate Commerce Commission ("ICC") transferred the regulation of motor carrier functions to the Department of Transportation ("DOT"), and to the Surface Transportation Board ("STB"). *See* 49 U.S.C. § 13501. The Federal Highway Administration, ("FHWA"), is within the DOT and administers and enforces regulations concerning lease agreements between motor carriers and owner-operators.

Arctic entered into a "Independent Contractor Motor Vehicle Lease Agreement" ("Lease Agreement"), with each owner-operator whereby the owner-operator leased a truck unit and provided, in return, the services of a qualified driver to Arctic.[3] Under the contract between D & A and the owner-operators, entitled the Lease/Purchase Option at Termination ("Lease/Purchase Option"), Members leased from D & A truck tractor units. Under this Lease/Purchase Option, Members were obligated to make weekly equipment rental payments to D & A and also were obligated to make payments based on mileage to a maintenance fund.

Under Paragraph 5A of the Lease Agreement, captioned "LEASE AND MAINTENANCE OBLIGATIONS," the Member agreed to have deducted a certain sum per week to pay D & A for his or her rental obligation; under Paragraph 5B, the Member agreed to have withheld nine cents per mile, also payable to D & A, "for the sole purpose of satisfying any maintenance obligations imposed upon Contractor by lessor of Contractor's equipment." Under Paragraph 9A of the Lease/Purchase Option entered into between D & A and the owner-operators, each Plaintiff who leased a motor vehicle was required to make maintenance payments at the rate of nine cents per mile. The maintenance payments were collected in a "maintenance fund." Arctic deducted the "maintenance fund" payments directly from the Member's compensation on a weekly basis.

Under Paragraph 9B of the Lease/Purchase Option, the maintenance fund balances were refundable if the lease ran its term. The fund balance was not refundable if the lease was terminated mid-term without the Member exercising his or her purchase option. None of the named Members in the present case exercised his purchase option, and therefore the maintenance fund balances were not refunded to the Members under the D & A Lease/Purchase Option.[4]

When the commercial driver's licenses of two of the Members, who are Plaintiffs to this suit, were canceled or suspended, they notified Arctic and their equipment leases were terminated.[5] The Plaintiff voluntarily terminated his equipment lease with Arctic. The Plaintiffs could have hired other drivers for the vehicles they leased from D & A; however, they did not, and as a result their Lease/Purchase Options with D & A were terminated before the end of the specified lease term. Their maintenance fund monies were not returned to them.

The maintenance fund, according to Steven R. Russi, Executive Vice President of

---

**3.** Defendants, through the September 4, 1997 Affidavit of Steven R. Russi, Executive Vice President of Defendants Arctic and D & A, acknowledge that the Members have entered into separate Agreements with D & A and Arctic. Before the D & A and Arctic agreements were executed, the Members were given an orientation program where the terms and conditions of each agreement were explained, the details of the individual Member's financial obligations were discussed, and the amount and circumstances of each monetary deduction from Member's settlements were disclosed and reviewed. The Member's acceptance of the terms of the agreement was established when each individual Member placed his or her initials at the end of the agreement. Each of the Plaintiffs in this case initialed in the appropriate space at the end of the agreement.

**4.** Under Paragraph 11 of the Arctic Lease Agreement, a separate escrow account was established for each Member, and those funds have been returned to the Members together with a full accounting as required by the federal equipment leasing rules.

**5.** Federal Regulations preclude regulated carriers such as Arctic from using the services of any driver who does not have a valid commercial driver's license.

Arctic and D & A, was established based on a "projected per mile cost" of maintaining a truck over the term of the lease. D & A contends that it costs nine cents per mile to maintain a truck through the first 500,000 miles of operation; though during the first 100,000 to 200,000 miles, the per-mile cost is much less than nine cents. When the truck is new, maintenance costs are minimal; the maintenance costs eventually increase as the truck ages. The Defendants charged the Members a flat rate of nine cents per mile to cover the total maintenance costs over lease term. The Defendants use the "savings" from the escrow fund during the first part of the lease to apply to the "deficit" that occurs toward the end of the lease.

For example, according to the September 28, 2000 Russi declaration, Plaintiff Wiese entered into a lease on June 11, 1996, for a term of 199 weeks. On March 27, 1997, less than ten months later, Plaintiff Wiese terminated his equipment lease. Prior to termination, Wiese drove 90,894 miles and spent $972.31 on maintenance of the truck, approximately 1 cent per mile. For the remaining thirty months, the truck was operated an additional 281,626 miles and D & A spent $30,467.80 to maintain the truck, at approximately 10.8 cents per mile. During the 155 weeks between the time Wiese terminated the lease and the ending date contemplated by the lease, Wiese made no further payments. Due to the alleged breach, Defendants claim that Wiese owed $67,062.74 in rental payments, in addition to the cost of maintenance for the life of the truck.[6]

Having been deprived of their escrow funds and other funds deposited with the Defendants during the terms of their Lease Agreement and Lease/Purchase Option, the Plaintiffs are seeking monetary damages and declaratory and injunctive relief, for themselves and on behalf of other similarly situated independent truck owner-operators.

## III. STANDARD OF REVIEW

In reviewing cross-motions for summary judgment, courts should "evaluate each motion on its own merits and view all facts and inferences in the light more favorable to the non moving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir.1994). Significantly, "[t]he filing of cross-motions for summary judgment does not necessarily mean that the parties consent to resolution of the case on the existing record or that the district court is free to treat the case as if it was submitted for final resolution on a stipulated record." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir.1991) (citing *John v. State of La. (Bd. of Tr. for State Colleges & Univ.)*, 757 F.2d 698, 705 (5th Cir.1985)).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by one party to the litigation. *Taft Broad.*, 929 F.2d at 248. Summary judgment is therefore appropriate "[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party

---

**6.** The Defendants brought Counterclaims on April 11, 2000 at the same time they filed their Answer to the Plaintiffs' Complaint. D & A brought individual Counterclaims against Plaintiffs Wiese, Roberts, and Harp alleging a breach of each Plaintiff's Lease/Purchase Option (Agreement). Arctic brought a Counterclaim against Plaintiff Roberts alleging a breach of the Independent Contractor Agreement (Lease Agreement).

lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir.1993). In response, the nonmoving party must present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir.1993). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

## IV. ANALYSIS

Following this Court's March 3, 2000 Opinion, only Count II remains, in which the Plaintiffs allege a violation of 49 C.F.R. § 376.12(k). In their Motion, the Plaintiffs move for Partial Summary Judgment as to Count II of their Complaint. In Response, the Defendants filed a Cross–Motion for Summary Judgment in which they request the same.

Under Count II, this Court has already found that the maintenance fund is an escrow fund under 49 C.F.R. § 376.2(l). *Owner–Operator Indep. Drivers Ass'n v. Arctic Express, Inc.*, 87 F.Supp.2d 820, 830 (S.D.Ohio 2000). Further, the Court found that the affiliation between D & A and Arctic was sufficient to impute the agreement of one company to the other and to bring D & A under the coverage of the Motor Carriers Act.

The sole issue remaining is whether the Lease Agreement and/or the Lease/Purchase Option are in violation of 49 C.F.R. § 376.12(k), which provides:

*Escrow funds.* If escrow funds are required, the lease shall specify:

(1) The amount of any escrow fund or performance bond required to be paid by the lessor to the authorized carrier or to a third party.

(2) The specific items to which the escrow funds can be applied.

(3) That while the escrow fund is under the control of the authorized carrier, the authorized carrier shall provide an accounting to the lessor of any transactions involving such fund....

(4) The right of the lessor to demand to have an accounting for transactions involving the escrow fund at any time.

(5) That while the escrow fund is under the control of the carrier, the carrier shall pay interest on the escrow fund on at least a quarterly basis....

(6) The conditions the lessor must fulfill in order to have the escrow fund returned. At the time of the return of the escrow fund, the authorized carrier may deduct monies for those obligations incurred by the lessor which have been previously specified in the lease, and shall provide a final accounting to the lessor of all such final deductions made to the escrow fund. The lease shall further specify that in no event shall the escrow fund be returned later than 45 days from the date of termination.

49 C.F.R. § 376(k). Paragraph 5B of the Lease Agreement entered between Arctic and the Plaintiffs provides:

Contractor hereby authorizes Carrier to deduct from Contractor's settlements, escrow fund, or other compensation *$.09* per mile, and to pay *D & A ASSOCIATES* of *HILLIARD OHIO* a like amount for the sole purpose of satisfying

any maintenance obligations imposed upon Contractor's equipment. The parties hereto acknowledge such deduction is necessary to ensure continued availability and protection of said equipment and property.

The Lease/Purchase Option entered into between D & A and the Plaintiffs, provides, in Paragraph 9:

A) Lessee, at its own cost and expense, shall maintain, service, repair and overhaul the equipment identified in Exhibit A so as to keep such equipment in as good operating conditions as when delivered to Lessee under this lease, ordinary wear and tear excepted. To facilitate compliance with the maintenance requirements set forth herein, Lessee agrees to the creation of a maintenance fund and to specifically authorize Lessor, or its designee, to administer such fund. The purpose of such maintenance fund is to ensure Lessee's compliance with the provisions of Paragraph 7 and Paragraph 9 herein. Said maintenance fund shall be created and financed by contributions of Lessee, each week, in an amount the equivalent of nine (9) cents per mile for each mile recorded on the odometer of the equipment identified and attached[.] [7]

B) Exhibit A. Should the amount in the maintenance fund exceed corresponding expenses for maintaining the equipment leased herein, such excess, if any, shall be paid Lessee only upon this Agreement running to term, as set forth in Paragraph 3 herein; should this Agreement not run to term in accordance with Paragraph 3 herein, such excess, if any, may only be used by Lessee for the *sole* purpose of exercising Lessee's Option to Purchase at termination, as defined in Paragraph 10A. WARNING: THE MAINTENANCE FUND ESTABLISHED HEREIN IS NON–REFUNDABLE, EXCEPT AS OTHERWISE PROVIDED IMMEDIATELY ABOVE.

The Plaintiffs request summary judgment as to Count II, wherein the they allege that the Defendants' Lease Agreement and/or Lease/Purchase Option is in violation of 49 C.F.R. § 376.12(k). In their Motion, the Plaintiffs argue that there is no genuine issue of material fact present since in Paragraph 5B of the Lease Agreement, nine cents per mile was agreed to be deducted from their compensation to satisfy maintenance obligations, and in Paragraph 9A of the Lease/Purchase Option, a maintenance escrow fund was created dedicated to the maintenance and recovery of leased equipment. Under Paragraph 9B of the Lease/Purchase Option, each Plaintiff was subject to forfeiture of any excess funds in the account. The Plaintiffs argue that Paragraph 9B is *per se* unlawful under § 376.12(k)(6) because it is a deduction of monies for which the owner-operator has not incurred any corresponding obligation. Pursuant to subsection (k)(6), these funds should have been returned within forty-five days of termination, but were not.[8]

Relying upon Paragraph 9B of the Lease/Purchase Option, the Defendants argue that had the Plaintiffs complied with the terms of Lease/Purchase Option, they would have received a full refund of the balance of the maintenance fund. That is,

---

7. Paragraph 7 is entitled "Return of Equipment/ACKNOWLEDGMENT ON RECEIPT." This paragraph includes the cost of transporting the equipment to the Hilliard, Ohio office of the Lessor, the cost of repair beyond normal wear and tear, and the cost of repairing the Qualcomm system.

8. Citing *Global Van Lines, Inc. v. ICC,* 627 F.2d 546 (D.C.Cir.1980), the Plaintiffs argue that the owner-operator cannot waive his rights through a contractual provision.

if, after terminating the lease early, the Plaintiffs had exercised their option to purchase, the balance of the fund would have been returned to them or credited toward the purchase of the equipment. Since the Plaintiffs did not satisfy the obligations of the Lease/Purchase Option, the maintenance funds were not returned to them.

The Defendants contend further that Paragraph 9B of the Lease/Purchase Option states the conditions that must be met to obtain a return of the maintenance fund, and that the Lease/Purchase Option authorized D & A to apply any funds owing to the Plaintiff toward the owner-operator's obligations under the Lease. As for the named Plaintiffs, the unpaid lease installments and actual maintenance expenses exceeded the balance of their maintenance funds.

■ This Court has previously found that Arctic and D & A, which are under common ownership and control, are affiliates. *Owner–Operator Indep. Drivers Ass'n v. Arctic Express, Inc.*, 87 F.Supp.2d 820, 829 (S.D.Ohio 2000). This finding brings D & A under the provisions of the Motor Carriers Act, as well as the Federal Regulations promulgated under the Act. In *Dart Transit Co.—Petition for Declaratory Order*, the Commission found: "We believe Dart should treat money remitted to Highway's maintenance reserve fund the same way it would if the money were remitted to Dart's own fund." 9 I.C.C.2d 701, at *18 (June 28, 1993). To resolve the pending motions for summary judgment, the Court must construe the Lease Agreement and the Lease/Purchase Option together, that is, "treat money remitted to [D & A's] maintenance reserve fund the same way it would if the money were remitted to [Arctic's] own fund," to determine whether the Agreements are in violation of § 376.12(k). *Id.*

### A. Paragraphs 5 and 9 of the Agreements

In Paragraph 5 of the Arctic Lease Agreement, the parties agreed to a deduction of nine cents per mile to be paid to D & A "for the sole purpose of satisfying any maintenance obligations imposed upon Contractor's equipment." [9] Turning to the Lease/Purchase Option entered into between the Members and D & A, Paragraph 9A provides for the creation of an escrow fund at a rate of nine cents per mile "to ensure Lessee's compliance with the provisions of Paragraph 7 and Paragraph 9 herein."

■ Initially, the Court finds that the creation of a maintenance escrow fund is

9. Paragraph 11 of the Lease Agreement establishes a general escrow fund:

11. *Escrow Deposit and Final Settlement*

A. In order to secure performance by Contractor of the terms and conditions herein set forth, Contractor authorizes Carrier to deduct forthwith from the time of execution of this Agreement, twenty-five dollars ($25.00) per week, which shall be placed by Carrier in escrow during the entire term of this Agreement. In no case and at no time shall said escrow exceed a balance of $1,200.00 at which time deductions shall cease until the balance has fallen below the maximum allowed balance. Upon termination of this Agreement and final settlement between Carrier and Contractor, said fund will be returned to Contractor. In the event Contractor's liabilities or authorized deductions to Carrier at the time of final settlement exceed the liabilities of Carrier to Contractor, Carrier is entitled to retain any such portion of the deposit, as is necessary to discharge Contractor's liabilities to Carrier at the time of final settlement. The date of final settlement between Contractor and Carrier shall be not more than sixty (60) days following Carrier's last payment to Contractor as set forth in Paragraph 4 of this Agreement.

B. While the escrow fund is under Carrier's control, Carrier shall provide to Contractor an accounting of any transaction involving such funds in individual weekly settlement summaries with Contractor.

not an inherent violation of § 376.12(k). Paragraph 5 of the Lease Agreement states that the monies will be used "solely for the purpose of satisfying any maintenance obligations imposed upon Contractor's equipment," while the Lease/Purchase Option states that the funds will be collected to ensure compliance with Paragraphs 7 and 9. Paragraphs 7 and 9, at first glance, seem to require no more than that the owner-operator satisfy the maintenance obligations incurred.[10]

■ The regulatory problem with the Lease/Purchase Option begins with Paragraph 9B. Paragraph 9B states that the maintenance fund shall be repaid to the Lessee "only upon this Agreement running to term . . . ," but if the lease does not run to term, the Lessee may only use the funds in conjunction with the exercise of his or her option to purchase the vehicle. Paragraph 9B concludes: "WARNING: THE MAINTENANCE FUND ESTABLISHED HEREIN IS NON–REFUNDABLE, EXCEPT AS OTHERWISE PROVIDED IMMEDIATELY ABOVE."

The Court finds that Paragraph 9B turns the ostensible maintenance escrow fund into "non-refundable" monies defaulted to the Defendants following an early lease termination unless the Member purchases the vehicle. Paragraph 9B of the Lease/Purchase Option is no different than the security deposit forfeited by owner-operators in *Owner Operator Independent Drivers Association v. Ledar Transport,*

No. 00–0258–CV–W–2–ECF, 2000 U.S. Dist. LEXIS 16271 (W.D.Mo. Nov.3, 2000). In *Ledar,* the plaintiff owner-operators filed a motion for preliminary injunction arguing that their lease agreement was in violation of 49 C.F.R. § 376.12. Ledar Transport, the defendant, was a federally regulated motor carrier. Ledar's lease agreement required the plaintiffs to pay a "security deposit" in the amount of $1,000. *Id.* at *12. Just as this Court did in deciding the Defendants' Motion to Dismiss, the *Ledar* court found the security deposit to be an "escrow fund" under § 376.2(*l*) and regulated by § 376.12(k)(6).

The lease agreement in *Ledar* further stated that if the lease were terminated "by Lessor for any reason within one year of the execution date thereof, then the security deposit should be considered an 'early lease termination fee' and shall be retained by Lessee [Ledar]." The court found that the provision of the lease agreement was in violation of § 376.12(k)(6), which requires the return of escrow funds within forty-five days. *Id.* at *12–*13. The court concluded that the early lease termination fee was a penalty "unrelated to actual costs involved with the operation of the leased equipment," an impermissible deduction under § 376.12(k)(6), and therefore illegal.[11] *Id.*

The Court finds that Paragraph 9B, which provides that if the "Agreement [does] not run to term" that "such excess" may be used "for the *sole* purpose of exer-

---

**10.** Paragraph 7 is entitled "Return of Equipment/ACKNOWLEDGMENT ON RECEIPT." It includes the cost of transporting the equipment to the Hilliard, Ohio office of the Lessor if the truck is abandoned, the cost of repairing the truck, and the cost of fixing any problems with the Qualcomm system. Paragraph 9 is specifically labeled "Maintenance," and states that "[t]o facilitate compliance with the maintenance requirements set forth herein, Lessee agrees to the creation of a maintenance fund. . . ."

**11.** The lease provision which allowed the security deposit to be used for "*all* monies due it by Lessor . . . such as, *but* not *limited to,* advances for fuel, security deposits, repairs, cash, loans, and claims" was found by the *Ledar* court to be in violation of § 376.12(k)(2) and (6) which requires deductions to be specified in the lease. The court concluded that the provision did not "adequately inform" the lessor of what could be deducted and therefore was illegal.

cising Lessee's Option to Purchase at termination, as defined in Paragraph 10A [Option to Purchase]," is an impermissible deduction, just as in *Ledar*. The Defendants' transformation of the maintenance fund into "non-refundable" monies is unrelated to the cost of maintenance of the Plaintiffs' vehicles, and therefore is in violation of § 376.12(k). The Court concludes that the non-refundable nature of the maintenance fund is no more than an early termination penalty thinly disguised by the Defendants, analogous to the security deposit in *Ledar*.

In this case, the Court need not find a "flat ban" or *per se* violation of § 376.12(k)(6) as the *Ledar* decision has been characterized, *see Renteria v. K & H Trans., Inc.*, No. 98–CV–290 (C.D. Cal. June 22, 2001), to find that D & A and Arctic violated § 372.12(k).[12] Even following *Renteria's* "substantial compliance" framework, this Court concludes that the Lease Agreement and Lease/Purchase Option are in violation of § 376.12(k). The Defendants here did not substantially comply, nor did they slightly comply. Arctic, behind the shield of an affiliated company, D & A, absconded with the Plaintiffs' escrow funds. Following the ICC's guidance, this Court will not let pass "abuses or the potential for abuse occasioned by collusion between a carrier and the third-party beneficiary of an equipment purchase deduction." *Dart*, 9 I.C.C.2d 701, at *13.

## B. Paragraphs 9B and 6

The Defendants urge this Court not find them in violation of 376.12(k) because that section "does not state what conditions must be met in order to have the escrow fund returned, only that the lease ... must disclose what those conditions are." The Defendants state that the Plaintiffs are incorrect in asserting that subsection (k)(6) requires the escrow funds to be returned "no matter what." To the contrary, the Defendants claim that subsection (k)(6) provides only that the lease must disclose the conditions the lessee must satisfy to reclaim the monies held in the escrow fund, and only if those conditions are met should the escrow fund be returned within forty-five days of termination. Since D & A disclosed in the Lease/Purchase Option the conditions that the Lessees had to fulfill to have their escrow fund monies returned, the Defendants conclude that they have satisfied the requirements of § 376.12(k)(6).

To support their argument, the Defendants rely upon Paragraph 6 of the Lease/Purchase Option:

6. *Authorization for Deduction*

Lessee hereby authorizes Lessor, or its designee, to make deductions from any monies due and owing Lessor from whatever sources for purposes of satisfying any and all obligations of Lessee arising under this Agreement. Said deductions shall be in accordance with the Schedule of Authorized Deductions, at-

---

**12.** On July 11, 2001, in support of their argument, the Defendants filed a Supplemental Memorandum to bring the Court's attention to *Renteria v. K & H Transportation, Inc.*, No. 98–CV–290 (C.D. Cal. June 22, 2001). In *Renteria,* six owner-operators brought suit alleging that the defendants were liable under the Motor Carriers Act and 49 C.F.R. § 376.12. In that case, the plaintiffs argued that literal compliance with the Regulations was required, while the defendants contended

that substantial compliance was required. The *Renteria* court found: "(1) that literal compliance with the provisions of the Regulations is not required; and (2) that four of the six written agreements between the plaintiffs and the defendants were not in substantial compliance with the Regulations." The court disregarded *Ledar's* "flat ban" rule and instead adopted a "substantial compliance/totality of the circumstances standard."

taches hereto as Exhibit B and incorporated herein.

While paragraph 9A, entitled "Maintenance Fund," authorizes a deduction in the amount of "$ .09 per mile per week" to ensure compliance with Paragraphs 7 and 9, the Schedule of Authorized Deductions, Exhibit B, permits the withholding of the Member's escrow funds for almost any conceivable obligation that could be incurred by the Member during the term of the lease. Exhibit B provides:

### SCHEDULE OF AUTHORIZED DEDUCTIONS

| PARAGRAPH | DESCRIPTION | AMOUNT |
| --- | --- | --- |
| 1 | Lease Payment | 400.42 per week |
| 5A & 5B | Public Liability Insurance and Property Damage (Bobtail & Physical Damage) | 53.54 per week |
| | Qualcomm | 12.00 per week |
| 9A | Maintenance Fund | $ .09 per mile per week |
| 9C | Maintenance Fund Deficiency | Actual Costs incurred |
| 11 | Federal Highway Use Tax | 9.62 per week |
| 11 | License Plate—IRP | 28.00 per week |
| 7A | Recovery of Vehicle Expenses | Actual expenses incurred plus $100.00 |

Pursuant to Paragraph 6, the maintenance fund can be used by the Defendants for, but not limited to, the payment of: Lease Payments, Public Liability Insurance and Property Damage, Qualcomm, Maintenance Fund, Maintenance Fund Deficiency, Federal Highway Use Tax, License Plate and Recovery of Vehicle Expense.[13]

Arguably, the Defendants have satisfied one requirement of § 376.12(k)(6) by disclosing the "conditions the lessor must fulfill in order to have the escrow fund returned," but in so doing have taken out-of-context a single sentence in a multi-paragraphed subsection of a lengthy regulation. The Court is not persuaded by the Defendants' claim that such disclosure satisfies § 376.12(k). Though Paragraph 9B is a violation of § 376.12(k) as an impermissible penalty, the Defendants try to obfuscate this violation by arguing that they have disclosed the conditions for the return of maintenance funds.[14] Under the Defendants' construction, Paragraph 6 ties the non-refundable maintenance fund to actual expenses incurred by the Member. The Court finds that the Defendants' theory fails, as the Schedule of Authorized Deductions renders § 376.12(k) meaningless. The fund no longer is a maintenance fund, as described by Paragraphs 5, 7 and 9, but is a general fund to satisfy any obligations incurred by the Members, which is in violation of the letter, see 49 C.F.R. § 376.12(k)(2) (providing that the lease must identify "specifications to which the escrow fund can be applied"), and spirit of the Regulations.

■ First, the Defendants violated the letter of the law when they did not disclose the "specific items to which the escrow fund can be applied." 49 C.F.R. § 376.12(k)(2). Paragraph 5 provides that the monies shall be used for the sole pur-

13. The Court notes that the items specified by Exhibit B are already covered by additional deductions from the Contractor's income; for example, $12.00 per week for Qualcomm and $28.00 per week for the license plate expense.

14. The Court initially notes that Paragraphs 7 and 9 make no mention of, nor do they cross-reference, Paragraph 6.

pose of establishing a maintenance fund. The Lease/Purchase Option, however, essentially permits the fund to be used for any and all expenses incurred (or yet to be incurred) by the Member. The Agreements' "specific items" are thus not "specific," since in practice they include any and all conceivable costs, referenced by Paragraph 6 and Exhibit B, to satisfy "any and all obligations of Lessee arising under the Agreement." When the Defendants provided for everything to be covered by the maintenance fund, they, in reality, specified nothing. As the I.C.C. has found: "the requirement that the lease clearly and specifically state the purpose of any fund collected from the lessor has been left intact in order to promote full disclosure." *Lease and Interchange of Vehicles*, 129 M.C.C. 700, 1978 MCC LEXIS 56, *57 *58 (1978). The Court finds that the Defendants have not disclosed "specific" items as they have disclosed "all" items.

Next, two ICC adjudications demonstrate how the Lease Agreement and Lease/Purchase Option violate the purpose behind § 376.12(k). *See Lease and Interchange of Vehicles*, 1978 M.C.C. LEXIS 56, at *56–*58 (answering the question of how many days should elapse before the funds are returned, and concluding thirty days as compared to forty-five); *Lease and Interchange of Vehicles*, 131 M.C.C. 141, 1979 M.C.C. LEXIS 67, *28–*29 (1979) (addressing how interest should be refunded along with the principal amount that has been kept in escrow).[15] Both adjudications are sympathetic to the plight

of owner-operators who often, prior to the promulgation of the Regulations, were denied the excess funds held in escrow by regulated motor carriers. In its 1978 opinion, the ICC found:

> We adopt the view that is necessary to establish strict time limits for the return of escrow. We note with concern data from the [Bureau of Economics] owner-operator survey showing that among lessors who in a previous lease put up escrow, one in four had not been repaid and did not expect to get his or her money back.

*Lease and Interchange of Vehicles*, 1978 M.C.C. LEXIS, at *57.

■ In its final analysis, the Court concludes that the adoption of the Defendants' argument that they have satisfied § 376.12(k) by describing the "conditions" for the return of escrow funds could lead to absurd results. For example, the Defendants could establish unrealistic conditions for the return of the excess funds, conditions that the Plaintiffs could never meet, rendering § 376.12(k) meaningless. The Defendants here established a maintenance escrow fund, that, in practice, can be apportioned under Paragraph 6 to "satisfy[ ] any financial maintenance obligation imposed." This structure impermissibly transmogrifies the maintenance fund into a repository of money that the Defendants can use to satisfy any obligation that they deem owed to them by the Member.

---

15. The 1978 decision was issued after a notice of proposed rulemaking was published in the Federal Register on November 23, 1977. The proceeding was initiated on the basis of two reports, "evidence gathered during congressional testimony before a special Subcommittee" and "testimony presented during Commission field hearings around the country." *Lease and Interchange of Vehicles*, 1978 M.C.C. LEXIS 56, at *1.

The 1979 opinion arose "[b]ecause the initial notice did not include formal rules, but rather discussed the proposals generally," resulting in a second notice being posted in the Federal Register on July 11, 1978. A comment period followed in which "[o]ver 70 carriers, owner-operators, shippers, unions, and Government agencies responded to the second notice...." *Lease and Interchange of Vehicles*, 1979 M.C.C. LEXIS 67, at *2.

## C. The Defendants' Financial Calculus

■ According to the September 28, 2000 declaration of Steven R. Russi, Executive Vice President of Arctic and D & A, the maintenance fund was established based on a "projected per mile cost" of maintaining a truck over the term of the lease. Russi states that it costs nine cents per mile to maintain a truck through the first 500,000 miles of operation; though during the first 100,000 to 200,000 miles, the per-mile cost is much less than nine cents. The Defendants charged the Members a flat rate of nine cents per mile to cover the total maintenance costs over lease term. The Defendants use the "savings" from the escrow fund during the first part of the lease to apply to the "deficit" that occurs toward the end of the lease. The Defendants therefore do not deny that they collected the funds the Plaintiffs seek to have returned, nor that they maintained the funds in excess of what was required either to repair or to maintain the truck prior to the Plaintiffs' early lease terminations.

The Defendants' post hoc rationalization is a red herring, as the reason for why they violated the Regulations is irrelevant. In addition, if a truck were re-leased following an owner-operator's early termination, and the maintenance costs total less than nine cents per mile over the life of the truck, there is no provision in either the Lease Agreement or the Lease/Purchase Option that insures the return the excess funds due to the owner-operator. This would create an escrow fund windfall for the Defendants, the very thing the Regulations were enacted to prevent. In any event, § 376.12(k)(6) requires the return of escrow funds no "later than 45 days from the date of termination," 49 C.F.R. § 376.12(k)(6), which cannot be accomplished by the Defendants if the Member must wait for the return of his funds until the truck has been turned into scrap metal.

Russi's declaration is helpful in that it provides a concrete example for discussing the issues presented in this case. As to Plaintiff Wiese, Russi states that following his early termination of his lease, Wiese's remaining rental payments totaled $67,062.47; the total maintenance expenses were incurred over the life of the truck were $31,440.11; only $972.31 in maintenance expenses were incurred prior to Wiese's termination of the lease, and Wiese owes D & A $30,467.80 for maintenance expenses, of which only $6,926.56 were covered by the balance of his maintenance account.[16]

It is a violation of § 376.12(k)(6) for the Defendants to charge Plaintiff Wiese for maintenance obligations that accrued after the Plaintiff defaulted on the lease, as they were not "incurred" by him. Section 376.12(k)(6) requires: "At the time of the return of the escrow fund, the authorized carrier may deduct monies for those *obligations incurred by the lessor* which have been previously specified in the lease." 49 C.F.R. § 376.12(k)(6). Since the maintenance expenses for a truck returned mid-lease have yet to occur, the obligations could not have been "incurred by the lessor," Plaintiff Wiese. The Defendants, therefore, lawfully cannot hold Wiese's $6,926.56 to pay for $31,440.11 in maintenance expenses that he did not incur.[17]

---

16. During the time that Wiese leased the truck, he drove it 90,894 miles, but the truck was driven an additional 281,626 miles following Wiese's early termination.

17. The Court questions how keeping approximately $6,926.56.56 from the Plaintiff can compensate the Defendants for an alleged $97,560.54 loss, and finds the Defendants' purported reason for keeping the Plaintiffs' escrow funds to be disingenuous.

Putting this aside, the Defendants, at the very least, had to provide the Plaintiffs with an accounting of the transactions that affected the escrow fund. Subsection (6) provides: "At the time of the return of the escrow fund ... [the authorized carrier] shall provide a final accounting to the lessor of all such final deductions made to the escrow fund." 49 C.F.R. § 376.12(k)(6). An accounting of deductions obviously could not have been compiled for maintenance expenses that had yet to occur, unless the Defendants are proficient in predicting the future. As for the allegedly due lease payments, the Defendants again could not provide an accounting of the lease payments due, since by their own numbers, the Defendants mitigated their loss and re-leased, in this example, Plaintiff Wiese's truck.[18]

◼ As shown by the ICC's 1978 opinion, the return of escrow funds is so important that registered motor carriers are not permitted to wait even nine months before returning the owner-operator's funds:

A modification to the recommended standard has been made to that section dealing with the return of escrow funds after termination of the lease. The original recommendation required payment within 30 days of termination. Carriers addressing this issue argue for extension of that time period. Some contend that since shippers can make claim on shipments for 9 months after delivery, carriers should be allowed to hold back a portion of the escrow fund to settle any claims that might come up after the lessor terminates. Carriers further argue that the recommendation provides no flexibility, and sets no requirements on lessors to meet the final terms of the lease, such as turning in license plates and permits. The modification requires carriers to clearly set out the responsibilities lessors must meet in order to obtain reimbursement of their escrow funds.

The period of time allowed for return of the escrow fund has been lengthened to 45 days. We adopt the view that is necessary to establish strict time limits for the return of escrow. We note with concern data from the BOE owner-operator survey showing that among lessors who in a previous lease put up escrow, one in four had not been repaid and did not expect to get his or her money back.

*Lease and Interchange of Vehicles*, 1978 M.C.C. LEXIS, at *57. Clearly, if the ICC passed § 376.12(k) knowing that the owner-operators would receive their escrow funds even before claims made by third-party shippers had ripened, the Defendants here cannot hold the funds to satisfy maintenance obligations that the Plaintiffs did not incur, or lease payments due in the future that were speculative at the time of the owner-operators' premature termination.[19] The Defendants' insistence on doing just that is a direct violation of 49 C.F.R. § 376.12(k).

## V. CONCLUSION

The Defendants' Cross Motion for Summary Judgment is **DENIED,** while the Plaintiffs' Motion for Partial Summary Judgment is **GRANTED.**

**IT IS SO ORDERED.**

---

**18.** The truck was driven an additional 281,626 miles following Wiese's early termination.

**19.** In drawing this conclusion, the Court does not reach the merits of the Defendants' Counterclaims since they relate to allegedly due lease payments.