[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 4, 2010
JOHN LEY
CLERK

_____

No. 07-11866

_____

D. C. Docket No. 02-01005-CV-J-25-MCR

OWNER-OPERATOR INDEPENDENT DRIVERS ASSOCIATION, INC.,
G.L. BREWER, on behalf of all others similarly situated,

Plaintiffs-Appellants-
Cross-Appellees,

GERALD E. EIDAM, JR., on behalf of all others similarly situated,

Plaintiff-Counter-Defendant-
Appellant-Cross-Appellee,

JAMES E. MICHAEL, on behalf of all others similarly situated,
ROBERT PENMAN, on behalf of all others similarly situated,
JAMES E. SCHMIDT, on behalf of all others similarly situated,

Plaintiffs-Appellants-
Cross-Appellees,

versus

LANDSTAR SYSTEM INC.,
LANDSTAR EXPRESS AMERICA, INC.,
LANDSTAR GEMINI, INC.,

Defendants-Appellees-
Cross-Appellants,

LANDSTAR INWAY, INC.,
LANDSTAR LIGON, INC., et. al.,

Defendants-Counter Claimants-
Appellees-Cross-Appellants,

QUALCOMM Incorporated,

Defendant-Intervenor-
Appellee.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

(October 4, 2010)

**ON PETITION FOR PANEL REHEARING**

Before EDMONDSON, KRAVITCH and ALARCÓN,[*] Circuit Judges.

ALARCÓN, Circuit Judge:

We deny appellants/cross-appellees motion for rehearing, we deny appellees/cross-appellants' motion for rehearing, we deny appellee/intervenor's motion for rehearing, withdraw our previously issued opinion and substitute the following in its place.

---

[*]Honorable Arthur L. Alarcón, United States Circuit Judge for the Ninth Circuit, sitting by designation.

The Owner-Operator Independent Drivers Association, *et al.*, ("Owner-Operators") represents truck owners and truck drivers who enter into lease agreements to provide equipment and services to haul freight in interstate commerce for Landstar System, Inc., *et al.*, ("Landstar") a motor carrier. The Owner-Operators have appealed from the judgment entered against them rejecting their claims that Landstar violated 49 C.F.R. § 376.12(d) and (h), provisions of the Truth-in-Leasing regulations, 49 C.F.R. § 376.1 *et seq.*, by failing to disclose in their lease agreements that banking fee charges would be deducted from compensation paid to the truck owners and drivers, and by failing to provide documentation regarding the computation of charge-back items including pricing information submitted by Qualcomm Incorporated ("Qualcomm"). The Owner-Operators also seek reversal of the District Court's ruling that they are not entitled to restitution or disgorgement.

We reverse the judgment in part because we conclude that the District Court erred in finding that Landstar was not required to disclose banking fee charges.

**I**

**A**

The District Court granted in part, and denied in part, the parties' cross-motions for summary judgment as to the issue of liability. The facts set forth in the

3

parties' oppositions demonstrate that Landstar is a motor carrier that hauls freight in interstate commerce under the authority of the United States Department of Transportation ("DOT"). The individuals who drive trucks under the Landstar name are represented in this case by the Owner-Operators who are independent truck owners and truck drivers who lease their equipment and driving services to Landstar. Landstar compensates the Owner-Operators by giving them a specific percentage of the revenue on the hauled freight.

As a DOT-authorized motor carrier, Landstar is required to enter into written leases with the Owner-Operators.[1] As part of the written lease agreement, Landstar charges the Owner-Operators fees. For example, the record shows that Landstar is required to use "Powertrack" for military loads. Powertrack is an electronic billing and payment system at U.S. Bank. U.S. Bank charges Landstar a payment processing fee to use the Powertrack system. Landstar charges the Owner-Operators for this fee, but nowhere in the lease is this specific banking charge listed. Rather, the lease provides that the Owner-Operators' compensation is subject to adjustment due to fees owed to "third parties." Lease, Appendix A, ¶ (a)(2).

---

[1] *See* 49 C.F.R. § 376.11 (providing that "the authorized carrier may perform authorized transportation in equipment it does not own only under the following conditions: (a) Lease. There shall be a written lease granting the use of the equipment and meeting the requirements contained in § 376.11 . . . .").

Landstar also offers programs to the Owner-Operators so that they have the opportunity to purchase products and services they need to run their businesses. For example, Landstar's programs include the "LCAPP Tire Program"[2] under which the Owner-Operators can opt to purchase tires for their tractors or trailers from Landstar. Landstar charges the Owner-Operators an administrative fee for processing the purchase.

Landstar also offers the Owner-Operators an opportunity to purchase Qualcomm's services. Qualcomm, Landstar's third-party vendor, has a written agreement with Landstar under which it provides satellite communication and equipment services to the Owner-Operators. Qualcomm negotiated the terms of its agreements with Landstar. As part of those negotiations, Qualcomm required that Landstar keep confidential the terms of its agreement with Qualcomm, including pricing. Landstar charges a flat-fee to the Owner-Operators who opt to use Qualcomm's services, but Landstar does not disclose the amount it pays to Qualcomm for the services.

The Owner-Operators may voluntarily purchase the LCAPP Tire Program and Qualcomm's services from Landstar through pre-compensation advances. These advance and subsequent deductions from the revenue are referred to as

---

[2] LCAPP stands for "Landstar Contractors' Advantage Purchasing Program."

"charge-backs."  Landstar repays the advances when the Owner-Operators'

compensation is settled.  Landstar settles with the Owner-Operators by providing

written descriptions of the revenue earned and the charge-backs on weekly

"settlement statements," which the parties reference as a receipt similar to a "pay

slip."  The settlement statements list the amount the Owner-Operators paid for the

charge-backs.  The settlement statements do not show how the charge-back items

were computed, how much Landstar marks-up the charge-back item, or how much

profit Landstar makes from the charge-backs.

**B**

The Owner-Operators brought a class action lawsuit against Landstar

alleging that the leases violate § 376.12(d)[3] and (h)[4] of the Truth-in-Leasing

---

[3]  49 C.F.R. § 376.12(d) provides:
> (d) Compensation to be specified. The amount to be paid by the authorized carrier for equipment and driver's services shall be clearly stated on the face of the lease or in an addendum which is attached to the lease. Such lease or addendum shall be delivered to the lessor prior to the commencement of any trip in the service of the authorized carrier. An authorized representative of the lessor may accept these documents. The amount to be paid may be expressed as a percentage of gross revenue, a flat rate per mile, a variable rate depending on the direction traveled or the type of commodity transported, or by any other method of compensation mutually agreed upon by the parties to the lease. The compensation stated on the lease or in the attached addendum may apply to equipment and driver's services either separately or as a combined amount.

[4]  49 C.F.R. § 376.12(h) provides:
> (h) Charge-back items. The lease shall clearly specify all items that may be initially paid for by the authorized carrier, but ultimately

6

regulations because Landstar did not disclose reductions for fees, like Powertrack, before calculating the Owner-Operators' compensation, and failed to disclose or document mark-ups and profits made on charge-back items. In the complaint, the Owner-Operators alleged that the leases (1) violate § 376.12(d) because it "contained nothing regarding Landstar's practice of reducing shipping revenues before calculating [the Owner-Operators'] compensation," and (2) violate § 376.12(h) because the lease "failed to clearly specify that charge-backs included mark-ups for profits and fees and failed to disclose how the charge-backs were computed." Qualcomm filed a motion to intervene when it discovered that Landstar intended to disclose Qualcomm's confidential pricing information. The District Court granted the motion.

After the complaint was filed, Landstar executed a new lease (the "New Lease"), which purported to correct certain violations in the original lease (the "Original Lease"). The Owner-Operators subsequently filed an amended complaint. In the amended complaint, the Owner-Operators alleged that the New Lease violated § 376.12(d) because, although the New Lease discloses "Landstar's practice of understating shipping revenues," it "fails to provide the amount of the

---

deducted from the lessor's compensation at the time of payment or settlement, together with a recitation as to how the amount of each item is to be computed. The lessor shall be afforded copies of those documents which are necessary to determine the validity of the charge.

reductions or the method by which they are implemented." The Owner-Operators

also alleged that the New Lease violated § 376.12(h) because it "fails to disclose

how charge-back items are computed."

Pursuant to 49 U.S.C. § 14704(a)(2),[5] the Owner-Operators sought damages

and equitable relief, including restitution, disgorgement of Landstar's profits, and

injunctive relief.

Landstar moved to dismiss the complaint on the ground that the statute of

limitations had run. Landstar argued that the Owner-Operators' claims were

governed by a two-year statute of limitations as opposed to the four-year statute

asserted by the Owner-Operators. On June 4, 2004, the District Court ruled in

favor of the Owner-Operators finding that the four-year statute of limitations

applied to the Owner-Operators' claims.[6]

On August 30, 2005, the District Court certified the class as comprised of

"[a]ll owner-operators in the United States, who, after November 1, 1998, and

through the pendency of this proceeding, had or have leases with [Landstar] or

---

[5] 49 U.S.C. § 14704(a)(2) provides: "Damages for violations.--A carrier or broker providing transportation or service subject to jurisdiction under chapter 135 is liable for damages sustained by a person as a result of an act or omission of that carrier or broker in violation of this part."

[6] "This ruling, along with the class certification determination, are the subjects of Landstar's cross-appeal."

their authorized agents or business affiliates ('Lessors'), that are subject to federal regulations contained in Part 376, Code of Federal Regulations." The District Court stated, however, that "not all aspects of this case present common issues. For example, if these common questions are resolved in favor of the putative class, the issue of damages will be unique and subject to individualized proof."

Landstar appealed the class certification order. This Court denied Landstar's petitioner for permission to appeal on October 18, 2005. *Landstar, et al. v. Owner-Operator Indep. Drivers Ass'n, et al.*, No. 05-90034 (11th Cir. Oct. 18, 2005).

## C

On October 6, 2006, the District Court issued its ruling on the parties' cross-motions for partial summary judgment only on the issue of liability. First, the District Court denied Landstar's request to adopt a "substantial compliance" standard of review regarding § 376.12(d), and instead used the "literal compliance" standard.[7] In applying the literal compliance standard, however, the District Court ruled in favor of Landstar and determined that the leases complied with § 376.12(d). The District Court explained that there was no dispute that "compensation is calculated as a percentage of '98% of Adjusted Gross Revenue [(AGR)]'" and that the "leases set forth the specific deductions used to calculate

---

[7] On appeal, there is no dispute that the literal compliance standard is the appropriate standard to use.

AGR." The District Court found that "[t]his unambiguously falls within the myriad of possible compensation methods [under § 376.12(d)] upon which the parties may agree."

As to the Owner-Operators' § 376.12(h) claim, the District Court ruled in favor of Landstar that Landstar was allowed to profit from charge-back items. The District Court ruled in favor of the Owner-Operators, however, in finding that Landstar violated § 376.12(h) because it did not provide the Owner-Operators with "access to documents under the Original or New Leases which allow them to ascertain whether they are being properly charged."

**D**

On November 17, 2006, the parties filed a joint waiver of jury trial. In the joint waiver, the parties agreed that "with the exception of the resolution of Plaintiff's Motion for Partial Reconsideration [of the order on Plaintiffs' Motion for Summary Judgment], the phase of this case regarding whether Defendants did, or did not, violate the Federal Leasing Regulations has come to a conclusion." Subsequently, the District Court denied Plaintiff's motion for partial reconsideration. As to the issue of damages, the parties stipulated:

> Defendants reserve their right to argue that in a civil action, such as this, brought pursuant to 49 U.S.C. § 14704(a), equitable relief in the form of disgorgement/restitution is not an available remedy, but,

10

if it is, Plaintiffs have not demonstrated a legal or factual basis for the award of such relief. Plaintiffs have reserved the right to seek damages pursuant to 14704(a)(2) in the event Defendants prevail in their argument that equitable relief in the form of disgorgement/restitution is not an available remedy.

**E**

There were a number of additional pre-trial motions and orders. Qualcomm, Landstar's third-party vendor, moved for a preliminary injunction asking the District Court to seal its confidential pricing information it provided to Landstar. On January 5, 2007, the District Court granted Qualcomm's motion, explaining that Landstar's charge-back for Qualcomm's services was "not a charge-back item as anticipated by Section 376.12(h) for which lessors must be afforded copies of Qualcomm's confidential pricing information to determine the validity of the charge."

On January 12, 2007, the District Court issued an order to define the scope of the bench trial. The District Court first determined that a breach of contract claim was not properly before the court because the Owner-Operators had not brought that claim in their complaint. The District Court explained that the "only claims remaining in this action are those regarding injunctive relief, damages sustained, and attorney's fees."

11

In the order, the District Court also granted Landstar's *motion in limine* which prevented the Owner-Operators from presenting evidence regarding unjust enrichment. The District Court rejected the Owner-Operators' argument that 49 U.S.C. § 14704(a)(1)'s provision for "injunctive relief" included the equitable remedies of restitution and disgorgement.[8] The District Court explained its conclusion as follows: "Congress has clearly and unambiguously provided for remedies in the form of injunctive relief, damages sustained, and attorney's fees – not restitution and disgorgement."

**F**

The three-day bench trial began on January 16, 2007. On the first day of the bench trial, the District Court heard oral arguments concerning Landstar's argument in its trial brief that the class should be decertified as to damages. The District Court ruled in favor of Landstar and decertified the class. The District Court explained that "issues regarding damages sustained by individual members of the Class would require unique and individualized proof." The District Court's

---

[8] 49 U.S.C. § 14704(a)(1) provides:
Enforcement of order.--A person injured because a carrier or broker providing transportation or service subject to jurisdiction under chapter 135 does not obey an order of the Secretary or the Board, as applicable, under this part, except an order for the payment of money, may bring a civil action to enforce that order under this subsection. A person may bring a civil action for injunctive relief for violations of sections 14102 and 14103.

12

decertification ruling applied only to the issue of damages, not to the issue of injunctive relief.

On January 17, 2007, at the close of the Owner-Operators' case-in-chief, Landstar presented an oral motion for judgment as a matter of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.[9] The District Court granted Landstar's motion as it related to damages, but denied the motion as it related to injunctive relief. The District Court explained that it would set forth its judgment concerning damages in a written order following the trial. Landstar renewed the motion on the issue of injunctive relief at the close of its case. The District Court took Landstar's renewed motion under advisement.

On March 29, 2007, the District Court entered an order setting forth its findings of fact and conclusions of law on the issue of damages and injunctive relief. First, as to damages, the District Court stated, in relevant part, the following findings of fact:

---

[9] Rule 52(c) provides:
> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

13

Plaintiffs presented insufficient evidence at trial tending to show that Plaintiffs sustained damages as a result of Defendants' failure to disclose documents to determine the validity of chargebacks . . . . To the contrary, Plaintiffs testified that it would even be beneficial to use Landstar's program, and that Plaintiffs have continued to purchase products and services through Landstar even after suit was filed . . . . The testimony diminishes Plaintiffs' claim of damages . . . . Plaintiffs were instructed that simply proving the Defendants charged more for a product or service than they paid a third-party vendor is insufficient, standing alone, to establish that Plaintiffs have sustained damages as a result of a disclosure violation under Section 376.12(h).

Based on these findings of fact, the District Court entered judgment in favor of Landstar on the issue of damages. The District Court concluded that the Owner-Operators were only entitled to actual damages because, under 49 U.S.C. § 14704(a)(2), "Defendants are [only] liable to Plaintiffs for 'damages sustained . . . as a result' of [a] violation." The District Court further explained:

The Court has unambiguously held that charge-back items which include fees and profits are not unlawful under Section 376.12(h) . . . . The Court finds that proof of the difference between Defendants' third-party costs and the prices they charged Plaintiffs does not, standing alone, establish that Plaintiffs sustained damages as a result of that violation . . . . Accordingly, the Court finds that Plaintiff's have failed as a matter of law to establish damages sustained as a result of Defendants' violation of Section 376.12(h).

14

The District Court also ruled on the scope of the Owner-Operators' claim for injunctive relief. The District Court determined that "[Landstar's] violation of Section 376.12(h) only applies to the LCAPP Tire Purchase Program." The District Court further explained:

> For all other programs at issue in this case [except the LCAAP Tire Purchase Program], Appendix C to the New Lease provides that Landstar's pricing to owner-operators is based on fixed rates and discloses that certain chargeback items include a charge for profits and fees. For those programs, the only documents necessary to determine the validity of those charges are documents showing that owner-operators were in fact charged the amounts that are stated in the lease. The evidence at trial demonstrates that Landstar provides settlement statements reflecting the amount that was charged back to the owner-operators . . . . Defendants' efforts to comply with the regulations have been demonstrated by their issuance of the New Lease in June 2004 and their considerable efforts to compile an elaborate disclosure plan subsequent to the Court's summary judgment Order . . . .

The District Court concluded that, although Landstar violated § 376.12(h), "Defendants have, nonetheless, demonstrated that they have discontinued the violation of the regulation." The District Court explained its conclusion:

> this Court finds that Defendants have expressed a sincere intent to comply with regulations. Defendants have also demonstrated that the effectiveness of the discontinuance presents no threat of future violations. Upon due consideration of these and other pertinent factors, the Court finds that an injunction shall not enter in this case.

15

The District Court granted Landstar's renewed motion for judgment as a matter of law. It also entered judgment in favor of Landstar on the issues of damages and injunctive relief. The Owner-Operators filed a timely notice of appeal.

**G**

The Owner-Operators appeal from seven of the District Court's rulings. First, the Owner-Operators appeal from the District Court's grant of summary judgment in favor of Landstar on the grounds that Landstar complied with § 376.12(d) and that Landstar is allowed to make profit from charge-back items under § 376.12(h). Second, the Owner-Operators appeal from the District Court's finding that Landstar complied with the requirements of § 376.12(h) because Landstar provided settlement statements to the Owner-Operators. Third, the Owner-Operators contend that the District Court erred in sealing Qualcomm's confidential pricing list. Fourth, the Owner-Operators appeal from the District Court's grant of Landstar's *motion in limine* which prevented the Owner-Operators from seeking restitution and disgorgement of Landstar's profits. Fifth, the Owner-Operators contend that the District Court erred in ruling in favor of Landstar on the Owner-Operators' claim for injunctive relief. Sixth, the Owner-Operators contend that the District Court erred in determining that they were entitled only to actual

16

damages under 49 U.S.C. § 14704(a)(2).  Seventh, the Owner-Operators assert that the District Court erred in decertifying the class as to the issue of damages.

We will address each of the Owner-Operators' arguments in turn.  We have jurisdiction to review the District Court's final order pursuant to 28 U.S.C. § 1291.

## II

The Owner-Operators appeal from the District Court's denial of their motion for partial summary judgment.  They argue that the District Court erred in two ways.  First, the Owner-Operators assert that the District Court erred in finding that Landstar had complied with the requirements of § 376.12(d).  Second, the Owner-Operators contend that the District Court erred in finding that § 376.12(h) allows Landstar to make profits on charge-back items.

"We review a grant of summary judgment by a district court *de novo*." *Shuford v. Fidelity Nat'l Prop. & Cas. Ins. Co.*, 508 F.3d 1337, 1341 (11th Cir. 2007).  "We apply the same legal standards that bound the district court and view all facts and reasonable inferences in the light most favorable to the nonmoving party."  *Id.* (citations omitted).  "The interpretation of a statute is a question of law subject to *de novo* review."  *United States v. Murrell*, 368 F.3d 1283, 1285 (11th Cir. 2004).

## A

The Owner-Operators contend that the District Court erred in granting partial summary judgment in favor of Landstar on the ground that the Original Lease[10] had complied with the requirements of 49 C.F.R. § 376.12(d). Specifically, the Owner-Operators maintain that the Original Lease violates § 376.12(d) because it fails to state that the Powertrack fee would be deducted from the driver's compensation. The Owner-Operators argue "the Powertrack reduction was not 'unambiguously' or 'clearly stated' on the face of the Original Lease as was found by the district court." As evidence to support their argument, the Owner-Operators point to the fact that the Original Lease did not have any reference to deductions for electronic processing fees, but the New Lease does.

In response, Landstar points to the appendix to the Original Lease which sets forth how Landstar computes the amount of AGR for a load. Compensation is based on a percentage of the AGR. As an explanation of that computation, the lease appendix defines, in relevant part, AGR as follows: "Adjusted Gross Revenue shall mean revenue to CARRIER . . . for commodities hauled by INDEPENDENT CONTRACTOR, reduced by . . . the amount paid to *any third party* by CARRIER in relation to movement of the load . . . [and by] all incentives, discounts, or commissions given to . . . *third parties*." Original Lease, Appendix

_____

[10] The Owner-Operators are raising this issue concerning only the Original Lease, as opposed to the New Lease.

18

A, ¶ (a)(2) (emphasis added). Landstar maintains that this language meets the requirements of § 376.12(d) because it sets forth a compensation method mutually agreed upon.

Section 376.12(d) provides, in relevant part:

> The amount to be paid by the authorized carrier for equipment and driver's services shall be clearly stated on the face of the lease or in an addendum which is attached to the lease . . . The amount to be paid may be expressed as a percentage of gross revenue, a flat rate per mile, a variable rate depending on the direction traveled or the type of commodity transported, or by any other method of compensation mutually agreed upon by the parties to the lease.

*See also supra* note 3.

While the language in the appendix to the Original Lease explains that the AGR will be reduced, it does so in broad terms, referring to "third party" fees. Such language does not "clearly" state that the computation of the amount to be paid may be reduced by payment processing fees like Powertrack. § 376.12(d). It is only fair that the Owner-Operators be put on notice how their compensation is specifically being reduced. The catch-all phrase of "third party" fees is insufficient to satisfy § 376.12(d) because it does not give adequate notice of any specific charges. Some district courts have ruled that § 376.12 requires more specificity. *See, e.g., Owner-Operator Indep. Drivers Ass'n v. Bulmatic Tr. Co.*, 503 F. Supp.

19

2d 961, 969 (N.D. Ill. 2007) (finding that a lease was ambiguous under § 376.12(d) because it failed to define the meaning of "gross revenue" or "specifically state which items, if any, may be excluded from gross revenue before calculating owner-operator compensation"); *Owner-Operator Indep. Drivers Ass'n v. Arctic Express, Inc.*, 159 F. Supp. 2d 1067, 1078 (S.D. Ohio 2001) (finding a violation of § 376.12(k) because language in the agreement of "'specific items' are . . . not 'specific,' since in practice they include any and all conceivable costs").

To meet the requirements of § 376.12(d), it is sufficient for the lease to provide a specific category which would encompass deductions like Powertrack fees. In the New Lease, Landstar has added a new category of deductions that specifically encompasses "payment processing fee[s]," which, the Owner-Operators concede, covers deductions like Powertrack. The language in the New Lease makes clear, on its face, the deductions to the driver's compensation. The Original Lease does not have this clarity.

Landstar cites *Tester Corp. v. United States*, 1 Cl. Ct. 370, 374 (Cl. Ct. 1982), for the proposition that a "revision to a contract does not prove that the older version was deficient." Landstar is correct. The revisions to the New Lease cannot constitute an admission that the language in the Original Lease was defective. However, Landstar's argument fails to address the problem that the

20

broad reference to "third party" fees in the Original Lease does not literally comply with § 376.12(d). Therefore, the District Court erred in ruling on summary judgment in favor of Landstar that the Original Lease meets the requirements of § 376.12(d).

**B**

On summary judgment, the District Court found that, as a matter of law, § 376.12(h) allows motor carriers to include administrative fees and to make profits on charge-backs. On appeal, the Owner-Operators contend that § 376.12(h) creates a flat ban on profits from charge-backs. The Owner-Operators argue that the Interstate Commerce Commission (the "ICC") "intended to eliminate the profit as a component of valid charge-backs."

This is an issue of first impression. The Truth-in-Leasing regulations are silent regarding a motor carrier's ability to profit on charge-backs. "'[I]f a statute is silent or ambiguous with respect to the question at issue, our longstanding practice is to defer to the executive department's construction of a statutory scheme it is entrusted to administer, unless the legislative history of the enactment shows with sufficient clarity that the agency construction is contrary to the will of Congress.'" *Lyons v. Ga.-Pac. Corp. Salaried Employees Ret. Plan*, 221 F.3d

1235, 1246 (11th Cir. 2000) (quoting *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 233 (1986) (internal quotations and citations omitted)).

In 1981, the ICC made the following statement concerning charge-backs:

> It appears that, in certain instances, carriers are defeating the intent of the present regulations by profiting from charge-back items at the expense of owner-operators. Charge-backs are items that may be paid for initially by the authorized carrier, but ultimately deducted from the lessor's compensation at the time of payment or settlement. We believe that all legitimate charge-backs and deductions should be clearly specified and identified in the lease and agreed upon between the parties. The carrier should not be in a position to manipulate these expenses in such a way that it makes a profit in its handling of these matters. *To the extent that charge-backs to owner-operators reduce the carrier's legitimate expenses, resulting in losses to the owner-operator and a profit to the carrier, they are not legitimate charge-backs or deductions.*

*ICC, Lease & Interchange of Vehicles*, 46 Fed. Reg. 44013-01, 44014-15 (proposed Sept. 2, 1981) *available at* 1981 WL 107853 (emphasis added).

The ICC then proposed to modify the charge-back provision "to require carriers to refund all amounts paid to the carriers which exceed the amount owed." *Id.* at 44015. The language of the 1981 proposed rule related to charge-backs provided:

> Charge-back items. The lease shall clearly specify all items and the amount of such items, including administrative costs, that may be initially paid for by the

22

> authorized carrier, but ultimately deducted from the lessor's compensation at the time of payment of settlement. *The carrier shall refund*, with interest computed by the same method as on escrow funds under section 1057.12(1)(5), on deductions which exceed 110 percent of the amount shown on the lease as deductible from the lessor's compensation.

*Id.* at 44015 (emphasis added). Thus, as noted, by the emphasized language in the ICC's comments and the proposed regulation, in 1981 the ICC considered prohibiting motor carriers from profiting from charge-back items.

The final rule relating to charge-backs, however, differed from the 1981 proposed rule in that the final rule did not require motor carriers to refund charge-backs or administrative costs. The current rule, adopted in 1982, provides:

> Charge-back items. The lease shall clearly specify all items that may be initially paid for by the authorized carrier, but ultimately deducted from the lessor's compensation at the time of payment or settlement, together with a recitation as to how the amount of each item is to be computed. The lessor shall be afforded copies of those documents which are necessary to determine the validity of the charge.

*ICC, Lease & Interchange of Vehicles*, 47 Fed. Reg. 51136-02, 51140 (proposed Nov. 12, 1982) (codified at 49 C.F.R. § 376.12(h)) *available at* 1982 WL 146684. *See also supra* note 4. Nothing in the adopted rule prohibits motor carriers from profiting from charge-back items. The ICC considered a prohibition on profits from charge-backs in 1981, but ultimately rejected making it part of the final

23

regulation. Thus, the District Court did not err in finding in favor of Landstar that, as a matter of law, Landstar can profit from charge-back items. *See, e.g., INS v. Cardoza Fonseca*, 480 U.S. 421, 442-43 (1987) ("'Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language.'") (citations omitted).

Those courts that have considered this issue have come to a similar conclusion. *See, e.g., Albillo v. Intermondal Container Serv., Inc.*, 2000 WL 35436363, at \*17 (Cal. Sup. Ct. Sept. 20, 2000) (discussing charge-backs for insurance payments and finding that "defendants' apparent profit on the charge-back amounts is not illegal"), *aff'd in relevant part*, 114 Cal. App. 4th 190 (Ct. App. 2003); *Kellander v. Davidson Bros.,* 2003 WL 25267577, at \*5 (Pa. Ct. of C.P. June 18, 2003) (finding that the regulations do not prohibit deductions exceeding third-party costs).

The Owner-Operators cite to *Owner-Operator Independent Drivers Ass'n v. Ledar Transportation*, 2004 WL 5249148, at \*6 n.36 (W.D. Mo. Dec. 30, 2004), for the proposition that profits on charge-backs are unlawful. However, in *Ledar*, the district court's ruling mistakenly relies on the ICC's comments from 1981, instead of 1982, when the rule was adopted. *Id.* (citing to *Lease & Interchange of*

*Vehicles*, 46 Fed. Reg. 44013 (proposed Sept. 2, 1981)).  Thus, the Owner-Operators' reliance on *Ledar* is misplaced.

### III

The District Court ruled on summary judgment that, under § 376.12(h), Landstar must disclose the validity of charge-back items. The Owner-Operators do not dispute this ruling.  Instead they argue that this ruling was eroded by subsequent rulings from the District Court.  They assert that "[u]ltimately, the court ruled that the only documentation required by Section 376.12(h) was verification in Plaintiffs' settlement statements that the amount Landstar charged corresponded to the dollar amount specific in the written lease."

The District Court determined, as part of its findings of fact at trial, that Landstar's New Leases, with the exception of the LCAPP Tire Purchase Program, met the § 376.12(h) requirement because it provided "settlement statements" to the Owner-Operators "reflecting the amount that was charged back to owner-operators."  The Owner-Operators assert that Landstar failed to comply with the requirements of § 376.12(h) because the settlement statements, which the parties refer to as "pay slips," do not meet the requirements of § 376.12(h).  Landstar asserts that the regulation "requires only that the method for determining the charge be disclosed," which the settlement statements satisfy.  Landstar

25

maintains that nothing in § 376.12(h) requires Landstar to provide documents that would reveal its profits on charge-backs.

We review the District Court's entry of judgment in favor of Landstar, after the bench trial, *de novo*. *Mitchell v. Hillsborough County*, 468 F.3d 1276, 1282 (11th Cir. 2006). We review a district court's findings of fact for clear error. *Id*. However, a district court's interpretation of the federal regulations are reviewed *de novo*. *Murrell*, 368 F.3d at 1285.

Section 376.12(h) imposes two disclosure requirements on the use of charge-backs in a motor carrier's leasing agreements. First, the motor carrier shall "clearly specify" in the lease "all items that may be initially paid for by the authorized carrier, but ultimately deducted from the lessor's compensation at the time of payment or settlement, together with a recitation as to how the amount of each item is to be computed." Second, the motor carrier must also "afford [ ] copies of those documents [to the lessor] which are necessary to determine the validity of the charge."

The Owner-Operators argue § 376.12(h) requires Landstar to disclose its actual, third-party costs because they are necessary both for an accurate "recitation as to how each item is to be computed" and a determination of the "validity of the charge." Landstar admits that § 376.12(h) mandates the disclosure of the motor

26

carrier's third-party, actual costs for variable-rate charge-backs. For example, Landstar agrees that it must disclose its actual, third-party costs for charge-backs under certain variable-rate formulas: for instance, it admits that it must provide its actual costs for the LCAPP Tire Program, which specifies in the lease that the charge-back is "Landstar's vendor cost + $6 administrative fee." Landstar argues, however, that, "if the method is to charge a flat fee," § 376.12(h) requires them to provide only a settlement statement because the lease itself explains how each charge-back is computed (such as $1,650 per tractor per year for a base plate). Thus, the settlement statement is enough to allow the Owner–Operators to determine the "validity of the charge." Landstar further maintains that "[n]othing in Section 376.12(h) requires Landstar to disclose what it [actually] paid," which would reveal its profit. *Id*.

The issue before us, therefore, is whether the settlement statements satisfied Landstar's obligation to disclose the manner in which it computed flat-fee charge-backs. We conclude that 376.12(h) does not require Landstar to do more than disclose the flat-fee in the lease and follow up with settlement statements that explain the final amount charged back.

Because the parties both make sensible arguments about the plain language of § 376.12(h), our conclusion rests on "'the executive department's construction

27

of a statutory scheme.'" *Lyons*, 221 F.3d at 1246 (citation omitted). As we have

noted, the ICC's principal concern in its 1981 proposed rule on charge-backs was

that motor carriers were unduly profiting from charge-backs. Thus, the ICC

proposed to expand disclosure requirements for charge-backs "to provide that the

lease must specify not only what items are subject to charge back, but also how the

amount for each item, including administrative costs, is calculated in clear and

precise language." 46 Fed. Reg. 44013, 44015 (Sept. 2, 1981). Accordingly, the

proposed rule initially read: "The lease shall clearly specify all items *and the*

*amount of such items, including administrative costs*, that may be initially paid for

by the authorized carrier, but ultimately deducted from the lessor's compensation

at the time of the payment of settlement." *Id*. (emphasis added). The ICC,

however, deleted the italicized language from the final rule because of objections

to the "enormous" costs associated with such broad disclosure requirements:

> the parties feel that it would be impossible to set forth the exact
> amount of each item. In order to keep leases current, they would have
> to be amended several times each year because State laws frequently
> change. In many cases, the exact amount is not known until after the
> liability is incurred, as with fuel and other operating expenses.

*Lease & Interchange of Vehicles*, 47 Fed. Reg. 51136, 51139 (Nov. 12, 1982).

The ICC explained that it had incorporated these concerns into § 376.12(h).

For the section outlining the disclosure provisions for the lease, the ICC explained

that it was rejecting the requirement that the lease "state with specificity the amount of charge-backs" in favor of a regulatory regime where the lease would "contain the charge-back items, together with a recitation as to how the amount of each item is computed." *Id*. This explanation clearly shows that cost concerns led the ICC to abandon a proposed requirement that motor carriers disclose their actual costs on the face of the lease. *See Cardoza Fonseca*, 480 U.S. at 442-42. Thus, the Owner-Operators' argument that § 376.12(h) requires the disclosure of Landstar's actual costs in the lease fails; disclosing the flat fee for a charge-back in the lease sufficiently allows the Owner-Operator to determine how each item is to be computed.

The ICC also explained that it was adding a supplemental disclosure requirement to § 376.12(h). It reasoned that to ensure access to "computation methods," the regulation would require the disclosure of those documents which are "necessary" to determine the "validity of the charge." *Id*. "[S]uch information," the ICC continued, would allow Owner-Operators "to ascertain whether these charges have been computed correctly." *Id*. The Owner-Operators are correct in arguing that this part of § 376.12(h) requires the disclosure of a motor carrier's actual costs in certain situations. But the ICC limited this requirement's application to instances when actual, third-party costs were

"necessary" to "ascertain whether these charges have been computed correctly."

For flat-fee charge-backs, the Owner-Operators do not need a motor carrier's

actual costs to determine whether the charge-back has been computed correctly.

Instead, a settlement statement which lists the number of units used multiplied by

each unit's flat-fee cost is enough to satisfy this part of § 376.12(h).

The regulatory history of charge-backs in the insurance section of the Truth-

in-Leasing regulations provides further support for this reading of § 376.12(h). *See*

49 C.F.R. § 376.12(l). In rejecting a proposed regulation mandating disclosure of a

motor carrier's actual insurance costs for insurance charge-backs, the ICC

explained,

> We believe that a prime concern of lessors in choosing insurance
> coverage is knowing exactly how much they will be charged. *With
> this information they are better equipped to obtain the best insurance
> coverage possible. It is the cost to lessors, not the cost to the carriers,
> which is critical to the lessors in choosing insurance coverage.*
> Therefore, at this time we will not require that carriers disclosure [sic]
> to the owner-operator the total cost of insurance that the carrier pays
> but will require the lease to specify the amount that the
> owner-operator will be charged for insurance provided by or through
> the carrier.

*Lease and Interchange of Vehicles* 131 M.C.C. 141, 150-151 (1979). When

considering the same change several years later, the ICC noted that it saw no need

to make changes "in view of our alteration of the proposed changes to

[376.12(h)]." 47 Fed. Reg. 51136, at 51139 (Nov. 12, 1982).

30

These comments demonstrate two things.  First, they are further evidence that the ICC knew how to write a provision that would require the disclosure of the motor carrier's actual costs but chose not to.  Second, they reveal the information that the ICC thought was important: the expected costs to owner-operators of the charge-back itself rather than the actual cost to the motor carrier.  If owner-operators know the price they will have to pay for a charge-back item, they can make an intelligent decision whether to purchase from the motor carrier or another source.

Although this is an issue of first impression in this Circuit, courts elsewhere have reached the same conclusion.  An Arizona district court rejected the argument that § 376.12(h) required the disclosure of actual costs for flat-fee charge-backs:

> The validity of the charge-back for fuel that an owner-operator purchases from [a carrier], for example, does not depend on the bulk discount price that [the carrier] pays its third-part[y] vendor or on the amount of whatever additional administrative fee [the carrier] adds to its discounted price, i.e. the actual amount of [the carrier's] mark-up, but on whether the amount of the fuel cost charged-back to the owner-operator, as noted on the settlement statement, is actually based on the same price disclosed to the owner-operator at the pump at the time he or she chose to purchase the fuel from [the carrier].

*Owner-Operator Indep. Drivers Ass'n v. Swift Transp. Co.*, 2009 WL 2983206 (D. Ariz. Sept. 15, 2009).  Furthermore, a state court relied on the regulatory history in rejecting a similar argument that a motor carrier had to disclose the "actual

31

insurance cost" that the carrier paid to its third-party insurance provider. *Albillo*, 2000 WL 35436363, at 16-17. Instead, the court concluded that the motor carrier only needed "to set forth an explanation that the computation is a flat rate assessed to all owner-operators." *Id*. at 17.

The Owner-Operators do not cite any cases that hold otherwise. Several of these cases they rely on stand for the undisputed proposition that a carrier must disclose third-party costs when such costs are necessary to a determination of the validity of a variable-rate charge-back. *See Owner-Operator Independent Drivers Ass'n v. C.R. England*, 508 F. Supp. 2d 972 (D. Utah 2007) (holding that a motor carrier violated 376.12(h) because it failed to specifically describe how variable-rate charge-backs were computed); *Tayssoun Transp., Inc. v. Universal Am-Can, Ltd.*, 2005 WL 1185811 (S.D. Tex. 2005) (concluding that a variable-fee charge-back—based on a "per trip fee" and a "range" of that fee—was a violation of 376.12(h) because it was "incomprehensible").

Two cases they cite involving flat-fee charge-backs are not persuasive. In the first, the court held that the carrier violated § 376.12(h) because it failed to disclose a $35 flat-fee charge-back in the lease, not because it failed to disclose its actual costs for the flat-fee, charge-back. *Rocor*, 2000 WL 35512897, at 3 ("ROCOR's argument that it need not disclose the method of computing the

$35.00 charge because is it a 'flat fee' does not alter the fact that it did not disclose the amount charged and has not provided 'copies of those documents which are necessary to determine the validity of the charge.'"). As for the second case, the Owner-Operators rely on language from a preliminary injunction order stating that a motor carrier must disclose its administrative costs on the lease. *Owner-Operator Indep. Drivers Ass'n v. Ledar Transp.*, 2000 WL 33711271 (W.D. Mo. Nov. 30, 2000) (holding that the defendant's lease violated 376.12(h) because it did not list 'cost plus administrative fees, etc.). This language, however, is unpersuasive because the court mistakenly relied on the ICC's comments from its 1981 notice of proposed rulemaking, rather than the final 1982 adopted rule, in reaching its conclusions. *See Ledar*, 2004 WL 5249148, at *6 n.36.

We therefore affirm the district court's holding that Landstar satisfied § 376.12(h)'s requirements by issuing the Owner-Operators settlement statements for its flat-fee charge-backs.

## IV

The District Court granted Qualcomm's motion for a preliminary injunction and sealed Qualcomm's pricing list that it provided to Landstar. In sealing the documents, the District Court found that Qualcomm's services were "not a charge-back item as anticipated by Section 376.12(h)." The Owner-Operators

appeal this ruling. They argue that § 376.12(h) entitles them to Qualcomm's pricing lists because the documents would reveal the profits Landstar made on charge-backs related to Qualcomm's services.

"We review the ultimate decision of whether to grant a preliminary injunction for abuse of discretion, but we review *de novo* determinations of law made by the district court en route." *Teper v. Miller*, 82 F.3d 989, 993 (11th Cir. 1996).

Here, the New Lease provides that Qualcomm's services cost "$65 per month . . . and $0.0003 per character/$0.02 per message when more than 60,000 charter/messages [sic] are used by [the Owner–Operator] in any month." The $65 per month charge is a flat-fee charge-back. The District Court, therefore, did not err by sealing Qualcomm's documents because § 376.12(h) does not require Landstar to provide these actual, third-party costs to the Owner-Operator.

## V

The Owner-Operators contend that the District Court erred in granting Landstar's *motion in limine* regarding unjust enrichment. They argue that 49 U.S.C. § 14704(a)(1)'s provision for "injunctive relief" includes the equitable remedies of restitution and disgorgement. They cite the Court's decision in *Porter v. Warner Holding Co.*, 328 U.S. 395 (1946) in support of this proposition. In

34

*Porter*, the Supreme Court interpreted § 2005(a) of the Emergency Price Control

Act which provides as follows:

> Such a jurisdiction is an equitable one. *Unless otherwise provided by statute*, all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction. And since the public interest is involved in a proceeding of this nature, those equitable powers assume an even broader and more flexible character than when only a private controversy is at stake.

*Id*. at 398 (emphasis added).

In response, Landstar argues that the Owner-Operator's reliance in *Porter* is

misplaced. They maintain that *Porter* "does not apply when the equitable relief

sought conflicts with the remedies actually provided by Congress." Landstar's br.

57. Landstar cites the following passage in the Supreme Court's decision in

*Meghrig v. KFC Western, Inc.*, 516 U.S. 479 (1996) in support of their argument:

"[It] is an elemental canon of statutory construction that where a statute expressly

provides a particular remedy or remedies, a court must be chary of reading others

into it." *Id.* at 488.

"[W]e review the district court's grant of a motion in limine for abuse of

discretion." *Mercado v. Orlando*, 407 F.3d 1152, 1156 (11th Cir. 2005).

Interpretations of federal statutes are reviewed *de novo*. *Murrell*, 368 F.3d at 1285.

35

Section 14704(a)(1) provides for "injunctive relief." *See supra* note 8. Neither the term "restitution," nor "disgorgement" appear in the statute. If § 14704(a)(1) allowed for restitution or disgorgement, it would have so stated. Injunctive relief constitutes a distinct type of equitable relief; it is not an umbrella term that encompasses restitution or disgorgement. *See Owner-Operator Indep. Drivers Ass'n v. New Prime, Inc.*, 213 F.R.D. 537, 545 (W.D. Mo. 2002) ("Although disgorgement is an equitable remedy, it does not qualify as injunctive relief."), *aff'd* 339 F.3d 1001 (8th Cir. 2003), *cert. denied*, 541 U.S. 973 (2004).

The Owner-Operators cite to the Savings Clause, 49 U.S.C. § 13103, for the proposition that the district court can impose broad equitable remedies for violations of the Truth-in-Leasing regulations. We disagree. The Savings Clause provides that, "[e]xcept as otherwise provided in this part, the remedies provided under this part are in addition to remedies existing under another law or common law." *Id.* If the Savings Clause invoked all equitable powers, Congress would not have specifically provided for "injunctive relief" in § 14704(a)(1). *See, e.g., Fulfillment Servs., Inc. v. United Parcel Serv., Inc.*, 2006 WL 1061892, at *8 (D. Ariz. April 19, 2006) (explaining that the purpose of the Savings Clause "is to preserve all existing rights not inconsistent with those" the statute creates) (citing *Penn. R. Co. v. Sonman Shaft Coal Co.*, 242 U.S. 120, 123 (1916)).

36

We conclude that the district court did not err in determining restitution and disgorgement are unavailable under the Act, because in "[a]pplying the canons of *noscitur a sociis* and *ejusdem generis* , [a court] will expand on the remedies explicitly included in the statute only with remedies *similar in nature* to those enumerated." *Philip Morris USA, Inc.*, 396 F.3d 1190, 1200 (internal citations omitted) (emphasis added). Restitution and disgorgement are not similar in nature to injunctive relief.

**VI**

There is no dispute that the District Court correctly ruled that injunctive relief was available on a class-wide basis in this case. The District Court denied injunctive relief at the conclusion of trial because it determined that Landstar had "discontinued" violating § 376.12. The Owner-Operators assert that, because Landstar violated the regulations, the District Court "erred by failing to order injunctive relief." We agree.

The district court's determination not to issue injunctive relief is reviewed for abuse of discretion, *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002); however, a court "by definition abuses its discretion when it makes an error of law." *Koon v. United States*, 518 U.S. 81, 100 (1996) *superseded by statute on other grounds*, 18 U.S.C. § 3742(e).

As set forth above, Landstar violated § 376.12(d) by failing to disclose that the Powertrack fees would be deducted from the Owner-Operators' compensation. *See supra* II.A. Therefore, we conclude that this case should be remanded with instructions to determine whether injunctive relief is appropriate concerning this violation.

## VII

The Owner-Operators argue that, under 49 U.S.C. § 14704(a)(2), monetary damages are based on the profit that Landstar made from charge-back items. Landstar contends that damages must be measured by "actual damages." Landstar maintains that "Plaintiffs must show that, but for the violation, they would have made different choices, and, thereby, saved money." The District Court agreed with Landstar and ruled that "proof of profits and other overcharges is not standing alone proof of actual damages in this case." The District Court determined at trial that the Owner-Operators had not proved damages. The Owner-Operators appeal this ruling.

We review the trial court's determination that damages were not proved under the clearly erroneous standard. *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985). Interpretations of federal statutes, however, create issues of law which are reviewed *de novo*. *Murrell*, 368 F.3d at 1285.

38

The District Court's ruling that the Owner-Operators must prove actual damages is correct because it is supported by the plain language of the statute. A carrier "is liable for damages *sustained* by a person as a result of an act or omission of that carrier or broker in violation [of the regulations]." 49 U.S.C. § 14704(a)(2) (emphasis added). *See supra* note 5. This standard requires proof that the Owner-Operators sustained an injury as a result of Landstar's failure to comply with § 376.12. Such proof goes beyond simply pointing to Landstar's undisclosed profits. Rather, it requires owner-operators to show how they sustained damages because of the violations. *See, e.g., Owner-Operator Indep. Drivers Ass'n v. New Prime, Inc.,* 339 F.3d 1001, 1012 (8th Cir. 2003) (explaining that a finding of damages by a motor carrier under § 14704(a)(2) requires examination of "offsets, advances, and other items"). The Owner-Operators' argument that it is entitled to Landstar's undisclosed profits is akin to statutory or presumed damages, rather than sustained damages as required by § 14704(a)(2).

Those courts that have considered this issue have reached the conclusion that § 14704(a)(2) requires evidence of actual damages. *See, e.g., Rivas v. Rail Delivery Serv., Inc.*, 423 F.3d 1079, 1083 (9th Cir. 2005) ("Plaintiffs concede that the regulatory violations for which they sought injunctive relief caused them no injury. Because the Truth-in-Leasing violations caused them no injury, Plaintiffs

did not have Article III standing to bring suit against Defendant motor carriers for those violations."); *Owner-Operator Indep. Drivers Ass'n v. Arctic Exp., Inc.*, 288 F. Supp. 2d 895, 908 (S.D. Ohio 2003) (plaintiffs must "adduce evidence . . . sufficient to allow the fact finder to make a *just and reasonable estimate* of . . . damages actually suffered") (emphasis in original); *Owner-Operator Indep. Drivers Ass'n v. Swift Transp. Co.*, 2006 WL 2521183, at *4 (D. Ariz. Mar. 30, 2006) (finding plaintiffs must show actual damages); *Hall v. Aloha Intern. Moving Servs., Inc.*, 2002 WL 1835469, at *14-15 (D. Minn. Aug. 6, 2002) (same); *Robertson v. N. Am. Van Lines, Inc.*, 2004 WL 5026265, at *4 (N.D. Cal. Apr. 19, 2004) (same); *Kellander v. Davison Bros.*, 2003 WL 25267577, at *5 (Pa. Ct. C.P. June 18, 2003) (same); *Fed. Proc. Forms* § 66:191, *Prayers for Relief* ¶ 9 (2007) (suggesting that the proper prayer for relief is "for all *actual damages* for violations of 49 C.F.R. pt. 376 pursuant to 49 U.S.C.A. § 14704(a)(2)") (emphasis added).

To support their theory of damages, the Owner-Operators rely on state court cases that interpret the Florida Deceptive and Unfair Trade Act ("Florida's Act"). For example, they cite, *Turner Greenberg Ass'ns v. Pathman*, 885 So. 2d 1004, 1008 (Fla. App. Ct. 2004), for the proposition that under the Florida Act the proper measure of "actual damages" is undisclosed profits. This Circuit has defined

actual damages differently: "To recover actual damages, consumers must show that they suffered a loss because they relied on an inaccurate or incomplete disclosure." *Turner v. Beneficial Corp.*, 242 F.3d 1023, 1028 (11th Cir. 2001) (en banc) (explaining the meaning of "actual damages" under 15 U.S.C. § 1640(a)(1), the Truth-in-Lending Act).

The Owner-Operators also argue that Landstar violated the "Actual Payment Clause" of the leases when it failed to reimburse the Owner-Operators for undisclosed profits. The District Court correctly concluded that this damage theory is based on a breach of a lease provision, not a violation of § 376.12. Because the Owner-Operators failed to bring a breach of contract claim, this issue is not properly before the Court.

We hold, therefore, that the District Court correctly concluded that the Owner-Operators have to prove actual damages. The Owner-Operators also did not have the opportunity to prove whether they had sustained actual damages for Landstar's failure to comply with § 376.12(d). Therefore, this matter must be remanded for an evidentiary hearing to permit the Owner-Operators to produce evidence of any actual damages sustained by Landstar's violations of § 376.12(d).

**VIII**

The Owner-Operators also appeal from the District Court's decertification of the class. After ruling that the Owner-Operators had to prove actual damages, the District Court decertified the class. It explained that "decertification is appropriate because the determination of the remaining issue of damages in this case on a class-wide basis is unfeasible, unmanageable, and would not be superior to individual actions." "A district court's denial of class certification will not be disturbed absent an abuse of discretion." *Jones v. Firestone Tire & Rubber Co.,* 977 F.2d 527, 531 (11th Cir. 1992), *cert. denied*, 508 U.S. 961 (1993).

"It is primarily when there are significant individualized questions going to liability that the need for individualized assessments of damages is enough to preclude 23(b)(3) certification." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1260 (11th Cir. 2004). "Of course, there are also extreme cases in which computation of each individual's damages will be so complex, fact-specific, and difficult that the burden on the court system would be simply intolerable . . . but we emphasize that such cases rarely, if ever, come along." *Id.* (internal citations omitted).

The Owner-Operators argue that since their theory of damages is based on "the charge-back differential" (*e.g.*, Landstar's profits from charge-backs), damages for the entire class would be "easily calculated by computer" and would take "no more than four hours." The Owner-Operators' argument fails because, as

discussed above, the correct measure of damages is actual damages, not Landstar's profits from charge-backs. Thus, each class member will have to offer evidence as to his or her actual damages, offset against any counterclaims. *See Heaven v. Trust Co. Bank,* 118 F.3d 735, 738 (11th Cir. 1997) (holding that class member's potential exposure to a defendants' counterclaim is a proper factor to consider); *see also New Prime,* 339 F.3d at 1012 (holding that district court properly denied class certification of owner-operators because damages under § 14704(a)(2) requires individual fact findings). Classes have been decertified in Truth-in-Lending cases where actual damages had to be proven. *See Turner*, 242 F.3d at 1026 (affirming the district court's denial of class certification on Truth-in-Lending claims for actual damages).

Damages for each class member may be different. Because the Owner-Operators failed to establish that actual damages can be easily calculated for all class members, the District Court did not abuse its discretion in decertifying the class for actual damages.

## IX

On cross-appeal, Landstar argues that the District Court erred in denying its motion to dismiss on the ground that the proper statute of limitations for damages under 49 U.S.C. § 14704(a)(2) is four years. Landstar maintains that 49 U.S.C. §

14705(c)[11] sets forth a two-year statute of limitations for subsection (b) of § 14704, and that the legislative history makes clear that, but for a "scrivener's error," subsection (a)(2) should have been included along with subsection (b).

There is no reason for this Court to rewrite a statute because of an alleged scrivener error unless a literal interpretation would lead to an absurd result. *See United States v. Ron Pair Enter., Inc.*, 489 U.S. 235, 242 (1989) ("The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'") (citations omitted); *In Re Leham*, 205 F.3d 1255, 1256 (11th Cir. 2000) ("There was no error in the decision that a literal application of the language of the statute would violate Congressional intent and would produce an absurd result.").

There is no absurd result imposing different statute of limitations for two different types of claims arising out of § 14704. Thus, for § 14704(a)(2), the default four-year statute of limitations under 28 U.S.C. § 1658(a)[12] applies. As one district court explained, "[t]he imposition of the two-year statute of limitations for

---

[11]   49 U.S.C. § 14705(c) provides: "(c) Damages.--A person must file a complaint with the Board or Secretary, as applicable, to recover damages under section 14704(b) within 2 years after the claim accrues."

[12]   28 U.S.C. § 1658(a) provides: "Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues."

one category of claims while retaining the general four-year federal statutes of limitations for the type of claims at issue in this case was a reasoned choice by Congress and the Court will not attempt to rewrite the statute." *Owner-Operator Indep. Drivers Ass'n v. C.R. England, Inc.*, 325 F. Supp. 2d 1252, 1265 (D. Utah 2004); *see also Owner-Operator Indep. Drivers Ass'n v. Swift Transp. Co.*, 2004 WL 5376210, at *6 (D. Ariz. July 28, 2004) (explaining that a imposing a two-year statute of limitations "would involve the substantial rewriting of a provision that is unambiguous on its face, not just the correction an obvious scrivener's error."). *But see Fitzpatrick v. Morgan S., Inc.*, 261 F. Supp. 2d 978, 982 (W.D. Tenn. 2003) (finding that two-year statute of limitations should apply).

## X

Landstar also asks on cross-appeal that, if this Court finds that Landstar violated the regulations, then the District Court be instructed to "revisit its original class certification decision so that the parties can brief whether . . . the key questions can be resolved on a class-wide basis."

The issues here concern summary judgment motions, other pre-trial motions, and judgment, all of which were litigated and decided in 2006 and 2007, years after the District Court certified the class in 2005. Thus, regardless of the holdings here, there are no new issues for the District Court to consider that it did not already

45

review when it originally certified the class. Landstar cites no authority to support its position. There is no reason to instruct the District Court to revisit the class certification issue.

Pursuant to Rule 28.1(c)(4) of the Federal Rules of Appellate Procedure,[13] the Owner-Operators have filed a motion to strike portions of Landstar's cross-reply brief on the ground that it addresses issues beyond what was presented in the cross-appeal. The Owner-Operators' motion to strike is denied. The arguments Landstar makes in the cross-appeal are related to the question of whether on remand the District Court should revisit its order certifying the class, an issue Landstar raised in the cross-appeal. *See, e.g.*, *Eskra v. Provident Life & Accident Ins. Co.*, 125 F.3d 1406, 1418 (11th Cir. 1997) (denying a motion to strike portions of a reply brief where argument was raised in initial brief).

## Conclusion

For the reasons stated above, we REVERSE the District Court's order on summary judgment that Landstar complied with 49 C.F.R. § 376.12(d). We REMAND this case with instructions that the District Court allow the Owner-Operators to seek injunctive relief concerning the violation of § 376.12(d).

---

[13] Rule 28.1(c)(4) provides: "Appellee's Reply Brief. The appellee may file a brief in reply to the response in the cross-appeal. That brief must comply with Rule 28(a)(2)-(3) and (11) and must be limited to the issues presented by the cross-appeal."

As to the issue of damages, we AFFIRM the District Court's ruling that the Owner-Operators have to prove actual damages under 49 U.S.C. § 14704(a)(2), but REMAND the case with instructions that there be an evidentiary hearing to permit the Owner-Operators an opportunity to produce evidence of actual damages, if any exists. We also AFFIRM the District Court's ruling decertifying the class as to actual damages.

We AFFIRM the District Court's ruling that the statute of limitations under 49 U.S.C. § 14704(a)(2) is four years.

**AFFIRMED**, in part, **REVERSED**, in part, and **REMANDED** for further proceedings consistent with this opinion.